(37 Misc. Rep. 315.)

## PETTUS v. PETTUS.

(Supreme Court, Special Term, New York County. February, 1902.)

DIVORCE—ADULTERY—EVIDENCE.

    A husband will not be granted a divorce from his wife, on the ground of adultery, on evidence that she had looked at another, while living at a boarding house, in a manner which seemed to the witnesses to show undue affection for him.

Action by Charles C. Pettus against Adelaide Pettus. Motion to confirm referee's report. Motion denied.

Robert A. Inch, for the motion.

BLANCHARD, J. This is an action for divorce brought by the husband against the wife. The referee before whom the case was tried has reported in favor of the plaintiff, and, although the confirmation of the report is not opposed by defendant, I cannot see my way clear to confirm the report. No specific act of adultery is alleged or proved. There is abundant proof of opportunity, but little of disposi-

tion. The defendant and the co-respondent lived for several years at the same boarding houses, and during most of the time the plaintiff was absent. They sat at the same table, and, when leaving the dining room, the proof is that, on occasions, the co-respondent would stop at the defendant's room. The defendant has denied any improper intimacy, and swears that the door of her room was never tightly closed while the co-respondent was in her room, and that while she lived with her husband the co-respondent was there at the invitation of her husband. There is no evidence of any improper affection or demonstration of fondness or intimacy on the part of the co-respondent towards the defendant. Dr. Anna L. White, one of plaintiff's witnesses, swears that she never saw any infatuation of the co-respondent for the defendant. She says: "He was like ice, always. He always seemed calm and perfectly undemonstrative." The same witness describes the defendant's actions towards the co-respondent as "solicitous" and "infatuated." I quote from her evidence, as being a fair sample from which I am asked to adjudge an improper intimacy as existing between these parties:

"Q. And did you observe their actions then? A. Yes, sir. Q. What did you observe? A. There is an accepted position of people who are intimate with each other, that they sometimes take, and we look on, and sometimes we see that plainly. That is the only explanation I can give you. Q. They were intimate? A. An intimacy that has gotten beyond talk. Q. Please describe why you thought they were affectionate? A. Simply from looking at Mrs. Pettus' face when she would look at Mr. Davenport. There was a steady, accepted knowledge in her looks, which she seemed to have, that he understood her and she understood him, which people who are courting or are not married or not intimate never have."

The look in Mrs. Pettus' face while gazing at Mr. Davenport may satisfy Dr. White of the existence of an improper relationship, but it does not satisfy the requirements of the law. In fact, there is no evidence in the case which is inconsistent with the relationship of friendship between Mrs. Pettus and Mr. Davenport. I would not be justified in inferring from the fact that Mrs. Pettus and Mr. Davenport were in each other's company much of the time, while dining and living at the same boarding houses, that the relationship was an improper one. There is a total absence of any specific acts of affection displayed by either of the parties towards the other. It would certainly seem as though witnesses who resided in the same house with the parties for months, and who were sufficiently observant to discover and interpret the nature of the look of a married woman for an unmarried man, both residents and boarders at the same house, would have been able to discover some outward and manifest mark of affection or intimacy, had such existed. I am not satisfied that the plaintiff has proven his case, and I must decline to confirm the referee's report.

Motion denied.